## EWING vs. THOMPSON,

The master is not responsible for the wilful and wanton acts of his slave, except where the statute has expressly provided. If, therefore, a slave feloniously kills the slave of another, the master of the slave who perpetrated the act is not liable to the owner of the slave killed for the injury he sustained by the loss of his slave.

### APPEAL FROM CLAY CIRCUIT COURT.

### STATEMENT OF THE CASE.

The record in this cause presents the following material fact. In September, 1848, the appellant was the owner of a slave named Anderson, and the appellee was the owner of a slave named Henry. Anderson was by law subject to work on a certain road district in Clay county, of which one Edward M. Samuel was overseer. The said overseer had notified the appellant to send his said slave to labor on said road, which he accordingly did, both on Friday and Saturday. The appellant, being over forty-five years of age, was not subject to work on roads, and was not present on either day. About eleven o'clock in the forenoon of Saturday, the slave Anderson, as well as the other laborers, were duly discharged from said road, at some point between the town of Liberty and the residence of the appellant. The road in question extends from said town by the house of the appellant to the steam boat landing of Major Turnham. The next that is seen of the slave Anderson, is at said landing, on the evening of the last mentioned day, and about twilight, he and the slave of the appellee engaged in a quarrel and fight, which resulted in the death of the latter. Thompson sues Ewing for the recovery of the damages alleged to have been sustained in the premises. His declaration is in trespass on the case, and is conceived in analogy to actions brought against owners, for injuries done by their animals of a dangerous and mischievous disposition. Ewing pleaded the statutory general issue. Upon the trial, the plaintiff below introduced testimony conducing to show that the slave Anderson was of a dangerous and murderous disposition, and that, with a knowledge of such disposition, the defendant below had negligently and unlawfully permitted said slave to go at large without his possession and beyond his control, and that while so at large he had committed the wrong complained of in the declaration. The defend-

ant below then introduced evidence conducing to show that his said slave was not of the disposition imputed to him, and generally rebutting the former evidence. After the evidence was closed on both sides, the court gave to the jury the following instructions:

2, "If they believe from the testimony, that the boy Anderson, the property of the defendant, was in the habit of becoming intoxicated, and drinking intoxicating liquors, and when so intoxicated, was of a quarrelsome, murderous and dangerous disposition, and defendant negligently suffered said boy to go off his farm from under his immediate supervision or control, or under the immediate supervision or control of any one else; and whilst so abroad he became intoxicated, and assaulted and killed a negro boy, the property of the plaintiff, and defendant knew of such habit of the boy Anderson beforehand, they will find for the plaintiff the value of the boy killed."

4, "If the jury believe from the evidence, that the defendant kept a negro boy Anderson, the property of the defendant, that said boy was in the habit of getting intoxicated, and when intoxicated was of a quarrelsome and murderous disposition, and the defendant knew the fact, and negligently suffered him to leave his farm ; and that said boy went to Turnham's, landing on the Missouri river on Saturday, became intoxicated, assaulted and killed a negro boy, the property of the plaintiff, then they will find for the plaintiff the value of the boy killed."

The defendant below then prayed the court to instruct the jury, as follows:

1. "That before the plaintiff can recover in this cause, he must prove the following four facts, to wit: *first*, that the defendant's slave in question, was of a murderous disposition: *second*, that such murderous disposition was known to the defendant: *third*, that with such knowledge the defendant unlawfully and negligently permitted said slaves to go at large ; and fourth, that whilst so unlawfully and negligently at large, the said slave committed the injury complained of in the plaintiff's declaration. The proof of one or any of said facts is not sufficient to authorise a recovery ; for such purpose all must be proved ; and if the plaintiff has failed to prove any or either of such facts to the satisfaction of the jury, then they will find for the defendant."

2. "That even a general, unlawful and negligent permission to go at large, will not, of itself, authorise the jury to find for the plaintiff. Before he is entitled to recover, he must show an unlawful and negligent permission to said slave to go at large at the time of the supposed injury ; and if the plaintiff has failed to prove that the defendant unlawfully and negligently permitted said slave to go at large at such time, and further, that such injury resulted from such permission, then they will find for the defendant."

3. "That if the jury believe from the evidence, that on the day of the alleged injury, the defendant was required by law to send his said slave to labor on a public road or highway, and that such injury was done while said slave was absent from the defendant for that purpose, then the defendant was but complying with the requirement of law; and from such compliance, the jury have no right to infer that he unlawfully or negligently permitted said slave to go at large on that day."

4. "That if the alleged injury was done by the defendant's slave, in question, while he was absent from the defendant for the purpose of laboring on a public road or highway, in obedience to the requirement of law, then, for any wrongs done by said slave, while so absent, the defendant is not liable."

5. "That unless the jury find from the evidence that the injury complained of in this cause was committed by the slave in question, under the authority, or with the knowledge and approbation of the defendant, then they will find for the defendant."

6. "That the law fixing the liability of owners for injuries done by their animals, either of a wild or tame nature, is not applicable to this case, in which it is sought to make the defendant, who is master, consequentially liable for an injury supposed to have been done by his slave." The relations of master and slave are analogous to those of master and servant at the common law, rather than to those of owner and beast, and the master cannot be held lia-

ble for wrongs done by his slave otherwise than upon the ground of an authority express or implied, except where a remedy is given against the master by statute. This suit is not brought upon any such statute, nor is it brought upon the ground of an authority express or implied. The jury are therefore bound, in any aspect of this case to find for the defendant."

7. "That although the jury may believe from the evidence, that other persons had seen the slave Anderson in circumstances, and known him to be guilty of acts indicating a quarrelsome and murderous disposition, yet, unless they also find from the evidence, that the defendant knew there was danger to the rights of others, in permitting Anderson to leave his premises and that he was disposed to commit murder and like crimes, when away from home, the defendant is not liable for the act complained of."

8. "That such acts and conduct of the slave Anderson, detailed in proof, as were never communicated to or known by the defendant, and such rumors and reports about said slave as never came to defendants knowledge, cannot affect the defendant in this trial."

The fourth, in this series of instructions, was given as prayed, and the others refused.

The court, of his own motion, then instructed the jury as follows:

1. "That before the plaintiff can recover in this cause, he must prove the following four facts, to wit: *first*, that the slave of the defendant, in question, was a quarrelsome and murderous disposition; *second*, that such disposition was known to the defendant; *third*, that with such knowledge, the defendant negligently permitted said slave to go at large, and *fourth*, that while so at large, the said slave committed the injury complained of in the plaintiff's declaration. The proof of one, or any of said facts is not sufficient to authorise a recovery. For such purpose all must be proved; and if the plaintiff has failed to prove any or either of said facts to the satifaction of the jury, then they will find for the defendant."

2. "By the *murderous* disposition mentioned in the instructions, is meant a disposition which would prompt the negro, if unrestrained, to take the life of his fellow being, and render it dangerous for him to be permitted to go at large with other negroes; and to determine whether the negro had this disposition, they will look to all the facts and circumstances in evidence."

The first of these instructions, thus given by the court of his own motion, was in lieu of the first prayed by the defendant below as before stated. Exceptions were had to the instructions thus given upon the prayer of the plaintiff below, and to those given by the court of his own motion, as also to the refusal of the court to give those prayed by the defendant below. The trial resulted in a verdict and judgment for the plaintiff below. The appellant then moved in arrest of judgment and for a new trial, which motions were severally overruled and exceptions taken. The cause is in this court by appeal.

EDWARDS for appellant.

1. The court erred in admitting all that part of the testimony of the witness Viotel, to the introduction of which exception was taken. 1. such testimony was but hear say and without the sanction of an oath, 2. It was irrelevant. The issue presented by the pleadings, involved the enquiry whether the slave in question was of a *murderous* disposition and habit, but his other vicious dispositions and habits were foreign to that issue, and evidence tending to prove them ought to have been excluded. The defendant below is not presumed to have come prepared to rebut evidence of facts. 1 Greenleaf Ev. 62, 205.

2. The court erred in giving the second and fourth instructions prayed by the plaintiff below. These instructions assume that it was the legal duty of the appellant to have had his slaves constantly under the supervision and control of himself or of some other person, and that for any wrong done by the slave under any negligent suspension of that supervision and control, the appellant is answerable. The other slave may have been in the wrong, either in an equal or less degree; he may even have been the aggressor; and yet if the slave of the appellant was of a murderous disposition, and he, with knowledge of such disposition, negli-

gently permitted his slave to go at large, and while so at large he killed the slave of the other, then the jury must find the value of the slave killed. The Roman law held the master liable for wrongs done by his slave ; but at the same time, it gave nearly as full power over the slave as the owner at common law has over his animal. By the civil law, however, the liability of the master was limited to the value of the *slave doing the wrong ;* and it was always in the option of the master to pay the the estimate of the damages, or surrender the body of the slave as a recompense. If we are driven to the Roman law for the liability, let us adopt the whole of that law in reference to master and slave; as well the measure of damages as the liability. If the master's liability is to be ascertained by that law, then for his protection, give him the same power over the life and actions of his slave which that law recognizes. It then follows, that the jury should have been told, that the measure of damages was the value of the defendant's slave. Wheeler on slavery, 236. Cawthorne vs Deas, 2 Port. Rep. 276.

3. The instructions given by the court of his own motion, are not perhaps sufficiently objectionable of themselves to demand a reversal of the judgment, but it is submitted that the first of those instructions was not called for, and presented the case in less satisfactory manner than that for which it was substituted. The case did not require nor authorize the modifications volunteered by the court.

4. The court erred in refusing the second and third instructions prayed by the defendant below.

1. The second correctly assumed the law to be that the defendant was not answerable to the plaintiff for any neglinence from which the defendant had not suffered. To fix the defendant's liability, it required proof of a wrongful permission of his slave to go at large at the time of the alleged injury, and that such injury naturally resulted from that permission. 2 Greenleaf Ev. 210 sec. 256; 1 Chit. Pleadings, 428, 1 Bac. Abr. 68.

2. The third instruction naturally followed the second. It announced a rule of evidence necessary to the safe determination of the cause.

5. The seventh and eighth instructions, prayed by the defendant below, announce a rule of evidence and present the question whether the defendant was liable, without notice of his slave's alleged disposition, and ought to have been given. Put the slave on the same level with the beast, and yet the owner is not answerable without previous notice of the particular vicious propensity. 1 Bac. Abr. 118; Vrooman vs. Lawyer, 13 John. Rep. 339. 1 Chit. Pl. 94.

6. The verdict was against the instructions of the court. There is no fact in the case better proven, than that the slave, at the time of the alleged injury, was absent from his master for the purpose of laboring on a highway ; and the jury were told, that in this event, the defendant was not liable.

7. The verdict is against the evidence. Besides upon general principles, the plaintiff was not entitled to damages even from the *gross* negligence of the defendant, unless the former were himself free from culpable negligence. 3 Bac. Abr. 60. So if the proximate cause of the injury were the plaintiff's own want of care. 1 Bac. Abr. 109.

8. The declaration in this cause is fatally defective. If the defendant's slave was a beast, *man suetae naturae,* and mischief resulted from his negligence, then, the remedy is care ; and it must be averred in the declaration and strictly proved upon the trial that the slave was *used* and *accustomed* to do like injuries. Vrooman vs. Lawyer, 13 John. Rep. 339, 3 Black. Com. 153 ; Bull. N. 77, 2 Chit. Plead. 597 note. If, however, the slave was *ferae naturae,* or naturally inclined to do mischief like that complained of, then the plaintiff's remedy was trespass *vi et. armis.* 1 Chit. Pl. 94. 209. Is the defendant's slave of the *harmless* or *savage* sort of beasts ? There was no averment that he was *used* or *accustomed* to do wrongs like that now imputed to him. It is however averred, that he was of a *dangerous, mischievous, ferocious savage* and *murderous disposition and nature.* Thus, upon the plaintiff's own showing, he has misconceived his remedy, if any he had, and for that reason the judgment ought to have been arrested.

9. But the great question in this case is presented by the fifth and sixth instructions pray-ed by the defendant below. Is the master, in any form of action, or under any state of care answerable for the unlawful and unauthorised wrongs of his slave? It is submitted that no such liability exists, either upon principle or authority, except where it is given by statute. Upon principle,

*First*, If the master's liability for the wrongs of his slave, is to be ascertained by the rules which fix his liability for the wrongs of his animal; then for his protection, he ought to be clothed with the same power over the former as over the latter. But this he has not; for cru-elty to his slave, he is indictable. Rev. Stat. 39 sec. 8, art. of the act concerning crimes and punishments.

*Second*, Such restraints upon slaves as are now urged, would render them as property wholly unproductive and worse than useless.

*Third*, Slaves with us are persons as well as property, and are so regarded and treated; both by the constitution and laws of the United States and of this State. See constitution U. S. Art. 1, sec. 2, clause 3; sec. 9, clause 1; Art. 4, sec. 2, clause 3. In this State, and in every State where slavery is recognised, they are regarded in this double aspect. As prop-erty, they are held to service and may be sold. As property, they are the subjects of bequests and descents. As persons, they are amenable to the criminal law, and are within the provis-ions of a criminal statute though not named. As persons, they are protected against the crimes of others, even the conduct of their master towards them, is regulated and governed by law.

Upon authority, first. At the common law, the master is not answerable for the wrongs of his servant. unless done while in his actual employ, or under his authority, express or im-plied. 1 Chit. Black. Com. 344 and notes, 2 Greenleaf Ev. 52.

*Second*, The courts of the United States have held the master liable for the wrongs of his slave in analogy to the common law of master and servant only. Boyce vs. Anderson, 2 Pet. Rep. 155; Clark vs. McDonald, 4 McCord's Rep. 223; Wheeler on slavery p. 1, 2 Murphy's N. C. Rep. 389; Wings vs. Smith, 3 McCord's Rep. 400; Wheeler on slavery 230; The State vs. Francis Anone, 2 Nott & McCord, 27; Snee vs. Trice, 2 Bay's Rep. 345; State vs. Daw-son, 2 Bay's Rep. 360; Wheeler on slavery 282; Cauthorne vs. Deas, 2 Post. Rep. 276; Wheeler on slavery, 236; 7 Smeade's & Marshall's Rep. 348; 2 Sup'l. U. S. Dig. 387, 7 Yey. 307.

*Third*, Our legislature has enacted, that for various wrongs done by slaves, their masters shall be civilly answerable to the party injured. Rev. Stat. 414, sec. 35. The statute evinces the legislative understanding, that by the common law, the master in such cases would not be liable. It is strictly remedial, giving a right of action where none previously existed. The suit at bar is not brought upon that statute, nor will it be pretended that the case comes with-in its provisions. Thus we have an appropriate subject for the application of the maxim, *expressio unius est exclusio alterius*. But this very case, in all its length and breadth, its height and depth, has been determined by this court. Jennings vs. Kavanaugh, 5 Mo. R. 26.

Leonard, for appellee.

1. Whoever occasions another any damage, in any manner, through his omission to do what he ought to do, or through his negligence in doing what he lawfully may do, must an-swer for the injury.

2. If a man have authority over another, and either expressly commands him to do an act, or puts him in a condition of which such act is the result, or by the absence of due care or control, negligently suffers him to do an injury, he is responsible for the act, as if it were his own act. Wayland vs. Elkins, 3 Eng. C. L. R. 84, note. Dixon vs. Bell, in note to 3

Eng. Com. L. R. 84; Littledale vs. Lansdale, 2 H. Black. R. 267; Bush vs. Strenman, 1 Bos. & Pul. 404.

3. Under our law, a master has dominion over the person of his slave, except so far as the law expressly restrains him. (State vs. Mann, 2 Dev. N. C. Rep. 263; cited in Wheeler on slavery, 245) and by the civil law, and also by the law of Louisiana, is liable for every wrong done by his slave, without any reference to his own conduct. (Cooper's Justiman, 354, 357 ; Puffendorf, book 3, p. 6 ; 1 Domat, 305 ; Gurrier vs. Lamberth, 9 Louisiana Rep. But, although this is otherwise here, (Jennings vs. Kavanaugh, 5 Mo. Rep. 26 ; Rev. Stat. of '45, page 414, sec. 35,) he is yet liable for the acts of his slave, upon the same principle and to the same extent, that the law subjects him to liability for the acts of those over whom he has control; and this is the principle on which the case was submitted to the jury, and the verdict found.

NAPTON, J., delivered the opinion of the court.

This action was brought to recover the value of the plaintiff's slave, who had been killed by a slave of the defendant's. The declaration contains five counts. The first count is in trespass for assault and battery, and has no support in the facts proven on the trial. The other four counts are varied forms of the same charge, and the substance of the charge is, that the defendant was the owner of a slave, who had a ferocious, murderous and mischievous disposition—that this slave, when suffered to go at large, was in the habit of beating and wounding other slaves—that the defendant knew of this propensity, and habit, and negligently permitted the slave to go at large—and that the slave, whilst so at large, wantonly and wilfully killed the slave of the plaintiff.

Various questions arose in the course of the trial, upon which errors have been assigned here, but our opinion upon the main question renders it unnecessary to notice the minor points of this case.

It will be readily seen, that all the various forms in which this action has been couched, depend upon the same hypothesis. They all assume as a principle of law, that the responsibility of the owner of the slave for the wilful wrongs of that slave is, at least as extensive as his responsibility for the injurious acts of his dog or his ox.

We understand both the municipal and moral law to be different. We understand the slave to be a responsible moral agent, amenable, like his master, both to the laws of God and man for his own transgressions—that the law which regulates our dominion over the brute creation is not the one which governs the relation of master and slave—that our municipal laws have not given to the master that absolute dominion over his slave which would enable him absolutely to present the commission of crime, and that the moral discipline which the law has entrusted to him, with a view to the prevention or reformation of bad habits, is but a

18

modification or perhaps extension of that authority which is given to the parent over the child, or the master over his servant. The power of the master being limited, his responsibility is proportioned accordingly. It does not extend to the wilful and wanton aggressions of the slave except where the statute has expressly provided.

This seems to be the view of the relation between master and slave, in all the states of the Union where slavery exists, excepting Louisiana where the civil law on this subject has been adopted, and possibly in some other states, as in this State, some slight modifications of the principle have been made by the State legislatures. We know that by the civil law, the responsibility of the master was more extensive; but we know also, that his power over the slave was much greater. With the comparative merits of the two systems we have, however, no concern. Any changes which may be thought desirable, are of course entirely with the legislature, and it is not our province even to suggest any. Certainly it would seem to be but just, if the responsibility which the civil law imposes upon the master is to be introduced in our code, the limits of that responsibility should also be fixed as it is in that code. The master was not held answerable in damages beyond the value of his offending slave. So our statute, where it has adopted this principle in certain cases, has in the same way limited the liability of the master.

It is quite obvious, that if it was deemed advisable to extend the responsibility of slave owners to cases like the present, such responsibility would not be based upon any assimilation of the slaves to irrational animals, but would be made entirely independant of the circumstances which were thought necessary to be averred and proved in the case now before the court. The existence of a ferocious and murderous propensity in the slave, and the *scienter* of the master are both averred in this declaration, and in fact constituted the very gist of the action. How was this to be proved? If we look at the record, we see there was no evidence on the subject. What is meant by this murderous propensity when asserted to exist in a rational being? Is it merely that recklessness of human life which is too often found, when the passions are aroused, or is it such a thirst for blood as characterizes a beast of prey and which, when found in a human being, might be fitly pronounced an index of insanity? If such a propensity as this can exist in a responsible human being, how are its effects to be guarded against by the master? He is not entrusted by our laws with the power of life and death, nor can he confine a slave as he might a vicious beast. Our statutes have defined the duties of a master towards his slave so far as they con-

cern the public welfare, but it is not alleged in this case that any of these duties were neglected, or that any breach of our laws was committed. If it even were so, the master would only be liable to the penalties prescribed in the law. He could not be held responsible for such remote consequences as the murder of another slave, should such a consequence be traced to a laxity of discipline not tolerated by our laws.

The judgment of the circuit court is therefore reversed.